**United States District Court**
For the Northern District of California

1
2
3
4
5                  UNITED STATES DISTRICT COURT

6                  NORTHERN DISTRICT OF CALIFORNIA

7

8  E-PASS TECHNOLOGIES,                    No. C-09-5967 EMC

9              Plaintiff,

10        v.                               **ORDER GRANTING PLAINTIFF'S
                                           MOTION FOR PARTIAL SUMMARY
                                           JUDGMENT**
11  MOSES & SINGER, LLP, *et al.*,

12              Defendants.                **(Docket No. 142)**

13  _____/

14

15              **I.    INTRODUCTION**

16        Plaintiff E-Pass Technologies, Inc. filed suit against Defendants Moses & Singer, LLP, and

17  Stephen N. Weiss, Esq., asserting claims for negligent misrepresentation, breach of fiduciary duty,

18  and professional negligence.  Second Amended Complaint ("SAC"), Docket No. 141.  Pending

19  before the Court is Plaintiff's motion for partial summary judgment.  Docket No. 142.  Plaintiff's

20  motion raises only one legal question: whether the parties had a valid tolling agreement in effect at

21  the time Plaintiff filed its action.  For the reasons set forth below, the Court finds that the tolling

22  agreement remained valid when Plaintiff filed this action.  Accordingly, the Court **GRANTS**

23  Plaintiff's motion for partial summary judgment.

24              **II.    FACTUAL & PROCEDURAL BACKGROUND**

25        E-Pass initiated litigation against Defendants in state court in January 2009, asserting claims

26  for (1) negligent misrepresentation, (2) breach of fiduciary duty, and (3) professional negligence

27  (*i.e.*, legal malpractice).  Ord Decl., Docket No. 20, Ex. A (docket sheet for state court litigation).  E-

28  Pass alleges that Defendants gave bad legal advice and caused it to pursue meritless patent

United States District Court

For the Northern District of California

1   infringement suits instead of negotiating licensing agreements. This (allegedly) frivolous litigation

2   strategy resulted in, *inter alia*, a trial court order in the underlying actions awarding fees and costs to

3   the prevailing parties against Plaintiff in an amount exceeding $2.3 million. *See* Kim Decl., Docket

4   No. 148, Ex. D.; *see also* SAC ¶ 35.

5        While the fee order was on appeal, and before Plaintiff had filed its malpractice suit, Plaintiff

6   informed Defendants (through new counsel) in May 2008 that it may have legal claims against them,

7   but that it wished to concentrate on winning the appeal because that could negate the need for any

8   claims. Fialkoff Decl., Docket No. 147, Ex. A. The parties subsequently negotiated a tolling

9   agreement that they finalized on August 18, 2008. *Id.* Ex. C ("Tolling Agreement").

10       The final agreement provided, in relevant part, that each side had potential claims it might

11  assert against the other, but that neither party wished to pursue such claims "at this time." *Id*.

12  Instead, the parties agreed that "[a]s to any claim that Claimant has against the Firm and/or the Firm

13  has against Claimant, with respect to which the applicable statute of limitations expires or expired

14  during the period commencing May 1, 2008 and ending December 31, 2009 (an "Expired Claim"),

15  and such Expired Claim is asserted by Claimant against the Firm and/or by the Firm against the

16  Claimant no later than December 31, 2009, the Firm and/or Claimant, as the case may be, shall not

17  interpose a defense of statute of limitations, laches, or any other defense based upon the lapse of

18  time, with respect to such Expired Claim." *Id.* ¶ 1. The agreement also contained an integration

19  clause, which provided, "This Agreement comprises the entire agreement of the parties with respect

20  to the assertion of the defense of statute of limitations, the doctrine of laches, or any other defense

21  based upon the lapse of time in any action or proceeding brought by either party against the other

22  arising from the Firm's representation of Claimant or the Claimant's alleged responsibility for

23  unpaid legal fees owed to the Firm." *Id.* ¶ 4.

24       On January 6, 2009, the Federal Circuit heard oral argument on Plaintiff's fee appeal.

25  Plaintiff filed suit against Defendants in state court three days later. Kim Decl., Docket No. 148, Ex.

26  D. The fee decision was affirmed by the Federal Circuit on March 20, 2009. *See* SAC ¶ 36.

27  Plaintiff served Defendants with the complaint on May 28, 2009. Opp. at 5.

28

**United States District Court**
For the Northern District of California

1    In October 2009, the state trial court granted Defendants' demurrer based on lack of subject

2    matter jurisdiction.  *See* Compl., Docket No. 1, Ex. A (order of state trial court, dated 10/1/2009).

3    The state trial court concluded there was no subject matter jurisdiction because the claims required

4    resolution of substantial questions of patent law.  *See* Compl. ¶ 7; *see also* Ord Decl., Docket No.

5    20, Ex. C (order of state trial court, dated 8/5/2009).  Thereafter, on December 21, 2009 – ten days

6    before the purported expiration date for the tolling agreement – E-Pass initiated this federal lawsuit.

7    E-Pass pled the same general claims in the federal lawsuit as in the state lawsuit based on the same

8    underlying facts.  Although the state appellate court later reversed the trial court's holding that it

9    lacked subject matter jurisdiction, Plaintiff has chosen to remain in federal court, which this Court

10   has permitted.  *See* Docket No. 127.

11   In their answer to the operative complaint, Defendant Moses & Singer asserted, "The SAC,

12   and each cause of action therein against Defendant, is barred, in whole or part, by the applicable

13   statutes of limitations, including but not limited to New York CPLR §214(6), California Code Civ.

14   Pro. §340.5, and Texas Civ. Prac. Rem. Code 16.003(a)."  Answer, Docket No. 145, at 13.  More

15   specifically, Defendants stated, "To the extent Plaintiff contends a Tolling Agreement extended the

16   time for Plaintiff to commence the instant action until December 31, 2009, Defendant denies that the

17   Tolling Agreement was still operative by reason of the commencement of the state court litigation in

18   January 2009 and/or the termination of the appeals of the underlying actions in March 2009."

19   Answer to SAC, Docket No. 145, at 14.

20   Plaintiff now brings the pending motion for partial summary judgment to determine whether

21   the tolling agreement was still in effect at the time it filed suit in federal court on December 21,

22   2009.

23                                          **III.   DISCUSSION**

24   A.    Legal Standard

25   Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be rendered on

26   a claim or defense, or part of a claim or defense, "if the movant shows that there is no genuine

27   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

28   Civ. P. 56(a); *see also* Rule 56(g) ("[I]f the court does not grant all the relief requested by the

**United States District Court**
For the Northern District of California

1  motion, it may enter an order stating any material fact – including an item of damages or other relief

2  – that is not genuinely in dispute and treating the fact as established in the case."). An issue of fact

3  is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

4  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "The mere existence of a

5  scintilla of evidence ... will be insufficient; there must be evidence on which the jury could

6  reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence

7  must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are

8  to be drawn in the nonmovant's favor. *See id.* at 255.

9  B.    <u>Applicable Law of Contracts - New York</u>

10       The parties agree that the Court must interpret the tolling agreement according to New York

11  contract law. *See* Mot. at 10-11; Opp. at 6; Fialkoff Decl., Ex. 6 ¶ 8 ("This Agreement shall be

12  interpreted in accordance with the substantive law of the State of New York.").

13       Under New York law, the Court's "role in interpreting a contract is to ascertain the intention

14  of the parties at the time they entered into the contract." *Evans v. Famous Music Corp.*, 1 N.Y.3d

15  452, 458 (2004). In examining the parties' intent, "a court must construe the terms of an agreement

16  as a whole and in a manner that gives effect to the mutual intent of the parties." *McGraw-Hill*

17  *Companies, Inc. v. Vanguard Index Trust*, 139 F. Supp. 2d 544, 552 (S.D.N.Y. 2001) *aff'd sub nom.*

18  *McGraw Hill Companies, Inc. v. Vanguard Index Trust*, 27 F. App'x 23 (2d Cir. 2001) (quoting

19  *Aramony v. United Way of America*, No. 96 Civ. 3962, 1997 WL 732447, at *5 (S.D.N.Y. Nov. 24,

20  1997)). "If that intent is discernible from the plain meaning of the language of the contract, there is

21  no need to look further." *Evans*, 1 N.Y.3d at 458. Thus, "a written agreement that is clear and

22  unambiguous on its face must be enforced according to the plain meaning of its terms, and extrinsic

23  evidence of the parties' intent may be considered only if the agreement is ambiguous." *Riverside S.*

24  *Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (2008) *aff'd*, 13 N.Y.3d 398 (2009)

25  (citing *W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 (1990)). "Where the meaning of a

26  contract term may be discerned from the contract language, 'courts are required to give effect to the

27  contract as written and may not consider extrinsic evidence to alter or interpret its meaning.'"

28  *McGraw-Hill*, 139 F. Supp. 2d at 553, quoting, *United States Trust Co. of New York v. Jenner*, 168

F.3d 630, 632 (2d Cir.1999). *See Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("[W]hen parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.") (citations omitted).

A contract is clear and unambiguous if "on its face [it] is reasonably susceptible of only one meaning." *Riverside*, 60 A.D.3d at 66 (quoting *Greenfield v Philles Records*, 98 N.Y.2d 562, 570 (2002)). "Conversely, [a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.* (internal citations and quotation marks omitted). However, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 98 F. Supp. 2d 498, 503 (S.D.N.Y. 2000) (quoting *W.W.W. Assocs.*, 565 N.Y.S.2d at 443); *see also Riverside*, 60 A.D.3d at 66 ("Parol evidence cannot be used to create an ambiguity where the words of the parties' agreement are otherwise clear and unambiguous.") (citations omitted). Nor can a court, "in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties." *Riverside*, 60 A.D.3d at 66 (citing *Teichman v Community Hosp. of W. Suffolk*, 87 N.Y.2d 514, 520 (1996); *Morlee Sales Corp. v Manufacturers Trust Co.*, 9 N.Y.2d 16, 19 (1961)). Whether a contract is ambiguous is a question of law for the Court. *Int'l Multifoods*, 98 F. Supp. 2d at 503.

C.   Plain Meaning of the Tolling Agreement

Plaintiff argues that the tolling agreement between the parties clearly and unambiguously allowed Plaintiff to file suit against Defendants in federal court on December 21, 2009, ten days before the tolling agreement expired. Mot. at 5, 13-14. Thus, Plaintiff contends that its federal suit is timely as a matter of law. The fact that Plaintiff had already filed suit against Defendants in state court in January 2009 is, according to Plaintiff, irrelevant because the contract, by its plain terms provided for no limitation on the number of times one could file suit within the tolling period, nor did it state that the contract would terminate once the party filed suit for the first time. Defendants, in response, argue that the contract terminated on the day Plaintiff filed suit in state court, January 9, 2009, because the entire purpose of the contract was to avoid litigation. Thus, Defendants claim, it

1   would be incongruous and contrary to the parties' intent to read the tolling agreement to allow

2   Plaintiff to file suit multiple times against Defendants.

3           In the instant case, the plain meaning of the tolling agreement favors Plaintiff.  The contract

4   states unequivocally that either party may bring "any claim" against the other party if such claim

5   was set to expire under the applicable statute of limitations between May 1, 2008 and December 31,

6   2009, so long as the party brings such claim no later than December 31, 2009.  Tolling Agreement ¶

7   1.  Defendants do not dispute that Plaintiff's claims against them expired during the relevant time

8   period and thus the December 31, 2009 extended deadline applies.  The contract contains no other

9   limitation.  The parties did not commit to, *e.g.*, wait until at least a certain date before they could

10  bring a suit.  At best, the parties merely expressed a general inclination that "none of the parties to

11  this Agreement desire that [either party] assert [its] actual or potential claims against the other *at this*

12  *time*."  *Id.* at 1 (preamble) (emphasis added).  The contract contains no provision by which a party

13  may terminate the tolling agreement before December 31, 2009.  The contract does not state that the

14  tolling agreement would terminate upon the filing of a lawsuit.  Nor does the tolling agreement

15  impose any limit on the number of actions a party may file within the tolling agreement, such that a

16  party would have only one opportunity to file suit.

17          The contract contains a clear integration clause, stating that the written agreement

18  "comprises the entire agreement of the parties with respect to" the timeliness of claims covered

19  within the agreement.  Based on the four corners of the contract, then, the Court concludes that the

20  plain language of the contract permitted Plaintiff to file suit in state court and, later, to file suit in

21  federal court within the stipulated tolling period.

22          Instead of challenging the plain language of the contract, Defendants raise two primary

23  arguments as to why the above reading of the contract should not control.  The Court considers each

24  in turn below.

25  ///

26  ///

27  ///

28  ///

United States District Court
For the Northern District of California

1.  Frustration of Purpose

First, Defendants argue such an interpretation frustrates the purpose of the contract, as its purpose was to avoid or delay litigation.  *See* Opp. at 7 ("[T]he clear purpose of the Tolling Agreement was the parties' mutual agreement that each would forbear from asserting actual or potential claims against the other until at least after the appeal was concluded.").  Once Plaintiff had filed suit, Defendants argue, there was no longer any purpose to the contract and therefore, it was no longer valid.

Under New York law, a party may invoke a defense to enforcing a contract where intervening events have frustrated its purpose.  In order to assert the doctrine of frustration of purpose, "the frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense." *Crown IT Services, Inc. v. Olsen*, 11 A.D.3d 263, 265 (2004); *see also Arons v. Charpentier*, 36 A.D.3d 636, 637 (N.Y. App. Div. 2007).  Thus, the "doctrine is a narrow one which does not  apply 'unless the frustration is substantial.'"  *Crown*, 11 A.D.3d at 265 (quoting *Rockland Dev. Assoc. v Richlou Auto Body, Inc.*, 173 AD2d 690, 691 (1991)).

In *Arons*, for example, the Appellate Division held that an intervening U.S. Supreme Court decision barring the recovery of certain expert witness fees rendered a contract unenforceable because its purpose was to compel the defendants to seek recovery of those fees. 36 A.D.3d at 637; *see also 528-538 W. 159th St. LLC v. Soloff Mgmt. Corp.*, 27 Misc. 3d 1216(A), 910 N.Y.S.2d 762 (Sup. Ct. 2010) (declining to enforce an arbitration agreement that was based on the parties' agreement to submit to an arbitration panel and comply with its discovery orders, where one party failed to comply with discovery orders and thereby precluded the panel from reaching a decision).

In the instant case, in contrast to the cases cited above, the problem for Defendants is that their proffered purpose for the contract does not match its terms.  Although they claim the purpose of the contract was to delay filing suit until after the underlying appeal was complete, the contract itself contains no such forbearance requirement.  New York law is clear that the court cannot read a provision into the contract that is not apparent from its terms. *See Riverside*, 60 A.D.3d at 68 ("Evidence outside the four corners of the document as to what was really intended but unstated or

**United States District Court**
For the Northern District of California

1   misstated is generally inadmissible to add to or vary the writing.") (quoting *W.W.W. Assoc.*, 77

2   N.Y.2d at 162).  Nor can the Court read a contract to give a party what it wishes it had negotiated

3   but failed to secure in the contract itself.  *See id.* at 69 ("It may be true that RSPC wanted to obtain

4   an unlimited and absolute commitment from Trump on behalf of his partnership or successors to

5   abide by certain Design Guidelines indefinitely and absolutely; however, what RSPC actually

6   obtained was only a limited and conditional commitment.  To ask this Court to ignore those

7   limitations and conditions is merely an attempt to obtain through litigation a result that RSPC was

8   unable to achieve during negotiations.").  If Defendants wanted Plaintiffs to wait until the

9   underlying appeal was complete before filing suit, they could have so drafted the tolling agreement.

10  They did not do so.  If they wanted to provide that once Plaintiff filed a lawsuit, all bets were off and

11  the tolling agreement was terminated, they could have so drafted such language.  Again, they did

12  not.  In short, there is no discernible purpose understood by both parties which was frustrated by

13  Plaintiff's filing of the state suit in January, 2009.

14          To be sure, it is theoretically possible that one purpose of the contract was to forestall the

15  parties from filing suit immediately after the tolling agreement had gone into effect given the

16  language of the contract indicating the parties did not wish lawsuits between them "at this time."

17  Filing suit "at th[e] time" of the agreement in August, 2008 would arguably have directly

18  contradicted one plausible purpose of the contract.  Tolling Agreement at 1.  But that did not happen

19  here.  Instead, E-Pass waited until January, 2009, over four months after the agreement became

20  effective in August 2008 to file suit.  It also waited until after oral argument and briefing was

21  completed in the appeal of the underlying case.  Thus, E-Pass did not file suit "at th[e] time" the

22  agreement was signed and did not frustrate this one plausible purpose.

23          To the extent Defendants claim the central purpose was to forestall *all* litigation and that

24  once one suit was filed, the purpose of the tolling agreement ended, there is nothing to support

25  Defendants' assertion.  The contract simply and plainly provided both parties with an extended

26  window of time in which to assert "any claim" they might bring against the other.  Tolling

27  Agreement at 1 & ¶ 1.  That one party asserted certain claims during the permitted time period did

28  not frustrate the overall purpose of the tolling agreement.  *See generally Rockland Dev. Associates v.*

United States District Court

For the Northern District of California

1  *Richlou Auto Body, Inc.*, 173 A.D.2d 690, 691 (1991) ("It is not enough that the transaction has

2  become less profitable for the affected party or even that he will sustain a loss.").  Similarly, that one

3  party asserted claims with sufficient time before the tolling deadline such that it could re-file those

4  claims if necessary in a different court does not frustrate any disclosed purpose of the contract.  *See*

5  *McGraw-Hill*, 139 F. Supp. 2d at 552 (court must focus on the "disclosed intent" of the parties).

6  That no broad purpose existed is evidenced not only by the plain wording of the agreement, but also

7  by the general knowledge that a non-contractual statute of limitations does not become inoperative

8  once a suit is filed; rather, a party can bring as many actions and claims as she wants (subject of

9  course to any applicable procedural constraints) before the statute of limitations runs out.  There is

10  nothing to indicate the parties intended the tolling agreement to function differently.  Defendants'

11  asserted purpose it claims was frustrated by Plaintiff's filing of the state court suit is not supported

12  by any construction of the contract; instead, it is fashioned out of whole cloth.  In short, it cannot be

13  said that any purported frustrated purpose of the tolling agreement was "so completely the basis of

14  the contract that, as both parties understood, without it, the transaction would have made little

15  sense."  *Crown IT Services*, 11 A.D. 3d at 265.

16         Accordingly, the Court rejects Defendants' frustration of purpose argument.

17         2.    Failure of Consideration

18         Second, Defendants argue Plaintiff's first lawsuit resulted in a failure of consideration, thus

19  voiding the contract.  Specifically, they contend that the consideration they were to receive under the

20  contract in exchange for Plaintiff's extended time to file suit was a delay in any potential litigation.

21  When Plaintiff filed suit in January, 2009, under this theory, that consideration was eviscerated

22  because there was no longer a delay in litigation.

23         Under New York law, "[f]ailure of consideration exists wherever one who has promised to

24  give some performance fails without his or her fault to receive in some material respect the agreed

25  quid pro quo for that performance.  Failure of consideration gives the disappointed party the right to

26  rescind the contract."  *Fugelsang v. Fugelsang*, 131 A.D.2d 810, 812 (1987) (quoting 6 Williston,

27  Contracts § 814 (3d ed. 1962)).  However, failure of consideration should not be confused with

28  adequacy of consideration, which courts generally cannot review.  *See First Fed. Sav. Bank (of*

*Delaware) v. Nomura Sec. Int'l, Inc.*, 93 CIV. 2519 (LAP), 1995 WL 217539, at *5 (S.D.N.Y. Apr. 12, 1995) ("The authorities are clear that failure of consideration can be a defense to an action for breach of contract, while the adequacy of the consideration is not a proper subject for the court's review, absent fraud or unconscionability.") (citing *Apfel v. Prudential-Bache Sec., Inc.*, 600 N.Y.S. 2d 433, 435 (N.Y. Ct. of App. 1993); *Spaulding v. Benati*, 456 N.Y.S.2d 733, 735 (N.Y. Ct. of App. 1982)).

In this case, Defendants read the contract to provide only one form of consideration: the parties' agreement that "none of the parties to this Agreement desire that Claimant and/or the Firm assert those actual or potential claims against the other at this time." Tolling Agreement at 1. Thus, according to Defendants, since forbearance was the only consideration, once Plaintiff filed suit in January 2009, Defendants no longer received any consideration.

There are multiple problems with this contention. First, the contract contains no guaranteed forbearance, as it only states that the parties did not want to file claims "at this time," not that they committed not to file claims until a certain specified time. Thus, even assuming that delaying litigation was the only consideration provided in the contract, Defendants still received a four-month delay in litigation. That the consideration Defendants received was not as valuable as they had hoped for does not render the contract unenforceable. *First Fed. Sav. Bank (of Delaware) v. Nomura Sec. Int'l, Inc.*, 93 CIV. 2519 (LAP), 1995 WL 217539, at *5 (S.D.N.Y. Apr. 12, 1995) ("If the agreed exchange has taken place, then no matter how woefully inadequate the consideration may be, the court must leave the parties to their bargain.") (citations omitted). *Cf. GMAC Mortg. Corp. of Pa. v. Weisman*, 95 CIV. 9869 (JFK), 1998 WL 132791, at *9 (S.D.N.Y. Mar. 23, 1998) ("The failure to pay [any] title insurance premiums voided the policies because there was a complete failure of consideration.") (internal citations omitted).

Second, by its terms, the contract provides for additional benefits that Defendants ignore. Indeed, Defendants attempt to create ambiguity in the contract by arguing that its phrase, "in consideration of the mutual promises stated in this Agreement," referred only to the parties' "desire" not to bring a lawsuit "at this time." Opp. at 11 (quoting Tolling Agreement at 1). However, the contract provides for consideration in the form of the "mutual promises stated in this Agreement,"

United States District Court

For the Northern District of California

1   for which "the parties agree as follows . . ." Thus, while one can construe the contract to provide for

2   delayed litigation as one of the "mutual promises" in the contract, it is not the only one. In addition

3   to the delay in litigation, Defendants received an agreement to toll the statute of limitations for any

4   claims *they* might bring against Plaintiff until December 31, 2009. Defendants also received a finite

5   commitment that Plaintiff could not assert any expired claims against them after December 31, 2009.

6    Plaintiff's January 2009 lawsuit did not vitiate these benefits.

7           That Defendants did not receive the full extent of each benefit they wanted does not create a

8   failure of consideration. In *Cobalt*, for example, the Southern District of New York rejected a

9   party's failure of consideration argument even though it claimed that the benefit it failed to receive

10  was the "central benefit that it sought" from the contract. *Cobalt Multifamily Investors I, LLC v.*

11  *Bridge Capital (USVI), LLC*, 06 CIV. 5738 KMW MHD, 2007 WL 2584926, at *6 (S.D.N.Y. Sept.

12  7, 2007). The court found that the party had received substantial benefits from the contract,

13  including the dismissal of claims against it and a prompt foreclosure sale. The only benefit the party

14  failed to receive was insurance proceeds that were conditioned on events outside the parties' control.

15  The court found that the party's receipt of certain benefits from the contract precluded a finding that

16  it had received nothing, and that "the fate of Eastern's hopes for an insurance recovery cannot be

17  deemed a failure of consideration." *Id.* at *7.

18          Similarly, in the case at bar, Defendants may have hoped that Plaintiff would delay filing any

19  lawsuit until after the appeal had concluded, that it would only file one lawsuit, or that it would file

20  no lawsuit at all. However, the contract did not guarantee any of Defendants' aspirations as to what

21  would happen; rather, it merely provided for the possibility that the parties could avoid a lawsuit,

22  and for a finite period of time in which either party could bring its lawsuit. In addition, as in *Cobalt*,

23  the fact that Defendants did not receive certain benefits they expected does not create a failure of

24  consideration because they received other benefits. Namely, they received a delay in litigation until

25  January 2009, an extended statute of limitations for any claims they wished to assert against

26  Plaintiff, and a finite deadline after which Plaintiff would not be able to assert any more claims

27  against them. In short, there was an exchange of consideration. Indeed, Defendants' argument here

28

is weaker than that in *Cobalt*, as the instant contract contains no conditional promise to, *e.g.*, not file suit unless certain events came to pass, or to not file suit until after a certain time.

Accordingly, the Court rejects Defendants' failure of consideration argument and concludes that the contract unambiguously permitted Plaintiff to file more than one suit within the agreed-upon tolling period.

D.   Extrinsic Evidence

Because the Court finds the contract to be unambiguous, New York law prohibits the Court from evaluating extrinsic evidence. Even if the Court determines that the contract is ambiguous, however, extrinsic evidence confirms Plaintiff's interpretation. For one thing, differences between this tolling agreement and others cited by the parties highlight the broad nature of the instant contract. *See generally Evans v. Famous Music Corp.*, at 459-60 (weighing extrinsic evidence, including comparing the contract provision at issue to other provisions used in the industry, in order to determine the meaning of the contract). Unlike other kinds of tolling agreements, this contract provides no limitation as to when within the tolling period a party must bring suit. In contrast, other tolling agreements provide a termination clause through which a party can give notice of intent to terminate and file suit; absent such notice, the party is under an obligation not to file suit. *See, e.g.*, *Ramirez v. CSJ & Co.*, 06 Civ. 13677 (LAK), 2007 U.S. Dist. Lexis 28901, at *4-5 (S.D.N.Y April 3, 2007) (discussing tolling agreement in which parties had agreed to a window of time before which party could not sue, and after which party could sue pursuant to a notice of termination); *In re Stantec Consulting Group (Fonda-Fultonville Cent. Sch. Dist.)*, 36 A.D.3d 1051, 1052 (N.Y. App. Div. 2007) (construing a "written agreement that tolled the limitations period in exchange for which each party agreed to forego arbitration" and that "was terminable by either party upon 30 days' written notice"). Thus, in these kinds of contracts, the parties agree not to sue before some specific date and the termination language explicitly contemplates that once a party files suit, the contract has terminated. Such language is not present in the instant case. In fact, Defendants removed similar termination language from an earlier draft of the contract that Plaintiff had originally proposed. *Compare* Fialkoff Decl. Ex. B ¶ 4 (Plaintiff's draft agreement providing that any party

United States District Court
For the Northern District of California

1   may terminate the agreement on 30 days' notice), *with id.* Ex. C (final agreement containing no

2   termination clause).

3       Second, none of Defendants' proffered evidence provides any indication that the parties

4   intended for the tolling period to operate only so long as neither party brought suit. Defendants

5   point to Mr. Fialkoff's declaration that "at no time during the negotiations of the Tolling Agreement

6   did I contemplate that the Tolling Agreement would continue in force after a lawsuit was filed.

7   From my perspective the sole purpose for the Tolling Agreement was to avoid the filing of a

8   lawsuit." Fialkoff Decl., ¶ 9. However, as discussed above, while the record suggests that avoiding

9   a lawsuit was *a* goal of the agreement, it does not support a conclusion that avoiding litigation was

10   the *only* goal of the contract. Rather, another apparent goal was to give *both* sides more time in

11   which to pursue their claims. Moreover, Defendants point to no evidence beyond Mr. Fialkoff's

12   statement that the contract would self-terminate once the first lawsuit was filed. As Mr. Fialkoff

13   admitted in deposition, the contract neither contains, nor did Defendants propose, any language that

14   would restrict either party to one action. Saba Decl., Ex. A (Fialkoff Depo.), at 76. Nor is there any

15   evidence that Plaintiff shared Mr. Fialkoff's private views.

16       Third, no evidence suggests that the parties agreed not to file suit before any specific time.

17   Although Defendants assert on summary judgment that the parties set the December 31, 2009

18   deadline to ensure that they would wait to file suit after the appeal was concluded, *see* Fialkoff Decl.

19   ¶ 5, Mr. Fialkoff's deposition indicated that the parties had contemplated filing suit after the appeal

20   was submitted, but before a decision had come down. *See* Fialkoff Depo. at 39-40. Indeed,

21   Plaintiff filed suit three days after oral argument in the underlying appeal, at which point it had

22   nothing further to do but await the Federal Circuit's decision. As Plaintiff points out, a party may

23   not create a genuine issue of fact by contradicting prior sworn testimony. *See Kennedy v. Allied*

24   *Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a

25   party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.")

26   (citations omitted). In any event, Defendants point to no evidence that the parties actually

27   committed to wait until a certain point to file suit. While Plaintiff's counsel did state in proposing

28   the initial tolling agreement that its purpose was to allow Plaintiff "to focus primarily on winning its

1  appeal," waiting until after Plaintiff had no more work to do on that appeal, but simply had to wait

2  for the decision, fulfilled that purpose.

3        Finally, Defendants' proffered comparison between the instant tolling agreement and

4  Plaintiff's failed negotiations with another law firm, Squire, Sanders and Dempsey ("Squire

5  Sanders"), does not change any of the above analysis.  Defendants offer evidence that Plaintiff

6  attempted to negotiate a similar tolling agreement with Squire Sanders and that, when such efforts

7  failed, it filed suit in January 2009 against both Squire Sanders and Defendants.  Opp. at 13-15;

8  Murphy Decl., Docket No. 149.  Defendants suggest that because Plaintiff treated Defendants, with

9  whom it had a tolling agreement, the same as it treated Squire Sanders, with whom it did not have an

10  agreement, its conduct somehow vitiated the tolling agreement it had with Defendants.  Opp. at 13.

11  However, Defendants offer no authority or analysis for why this is the case.

12       Defendants' extrinsic evidence therefore does not create a genuine issue of fact as to whether

13  Plaintiff was permitted to file a second lawsuit within the period permitted under the tolling

14  agreement.  Considering both the contract's language and extrinsic evidence, the contract contains

15  no requirement that the parties wait a certain amount of time before bringing suit.  Nor does the

16  contract place a limit on the number of times within said time period the party may sue.  Rather, the

17  parties merely agreed to give each side a time limit within which to file "any claims."  Accordingly,

18  the Court **GRANTS** Plaintiff's motion for partial summary judgment.

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion for partial summary judgment and finds that the parties' tolling agreement remained in effect when Plaintiff filed its claims in this action.

This Order disposes of Docket No. 142.


IT IS SO ORDERED.


Dated:  April 13, 2012

_____
EDWARD M. CHEN
United States District Judge