Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

| | |
|---|---|
| E-PASS TECHNOLOGIES, INC., a Delaware Corporation, ) ) ) Plaintiff, ) ) VS. ) MOSES & SINGER, LLP, a New ) York Limited Partnership; ) STEPHEN N. WEISS, ESQ., an ) Individual; and DOES 1 through 50, ) inclusive, ) ) Defendants. ) _____) | No. C 09-5967 EMC San Francisco, California Monday June 4, 2012 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**:        Rosen Saba LLP
                 468 North Camden Drive, Third Floor
                 Beverly Hills, California 90210
            BY:  **JAMES R. ROSEN, ESQUIRE**
                 **RYAN DONALD SABA, ESQUIRE**

**For Defendant**        Duane, Morris & Heckscher LLP
**Moses & Singer:**       One Market, Spear Tower, 22nd Floor
                 San Francisco, California 94105
            BY:  **RICHARD D. HOFFMAN, ESQUIRE**
                 **ROBERT M. FINEMAN, ESQUIRE**

**For Defendant**        LONG & LEVIT LLP
**Stephen Weiss:**        465 California Street, Suite 500
                 San Francisco, California  94104
            BY:  **DAVID SEAN MCMONIGLE, ESQUIRE**
                 **JESSICA R. MACGREGOR, ESQUIRE**

**Reported By:**    *Katherine Powell Sullivan, CSR #5812*
                *Official Reporter - U.S. District Court*

**P R O C E E D I N G S**

**JUNE 4, 2012**                                                    **4:03 P.M.**

**THE CLERK:**  Calling case C 09-5967, E-Pass versus Moses & Singer.

Counsel, please come to the podium and state your name for the record.

**MR. ROSEN:**  Good morning, Your Honor.  James Rosen of Rosen Saba, for the plaintiff.

**THE COURT:**  All right.  Thank you, Mr. Rosen.

**MR. HOFFMAN:**  Good afternoon, Your Honor.  Richard Hoffman for defendant Moses & Singer.

**MR. MCMONIGLE:**  Good afternoon, Your Honor.  Joe McMonigle on behalf of Stephen Weiss.

**THE COURT:**  All right.  Thank you, everyone.

I should let you know at the outset that I don't have an hour, two hours.  At this point I'd like to -- I do have to stop at about, if we go this long, quarter to.  So, forewarning you.

So this has been somewhat helpful, but I have to say I'm still a bit confused as to exactly what the scope of the plaintiff's claim is.  As I understood it, this case is about bad -- bad advice at the outset of this case, that there was a meritless series of cases that should not have been advised. E-Pass should not have been advised to go down the litigation

path, should have been advised to stick with the licensing path and, therefore, they would not have incurred -- it would not have incurred all these expenses and costs and fees and liability.

If that's the case, I have trouble understanding why -- what happened after that decision-making tree occurred, and if the recovery for that is everything that happened, including sanctions, including reverse fees, exceptional fees, including all the fees that were paid to defendants, that's all to be recovered because you stepped off the wrong path and off the cliff.

If that's the theory of the case -- you understand that there's going to be some merits analysis tied up because you have to look at was it a viable case to start with.  And that may involve was there a reasonable likelihood of success? Is there a reasonable construction of the patent that could have led -- opened the door to a reasonable victory, et cetera, et cetera.  But, it's not trying the case.  It's actually looking at what the evidence was, what was understood, what the theories were, were they viable at the time, et cetera.

Then I'm not sure why anything that actually happened after that, whether it was failure to oppose a transfer to San Francisco, whether it was a decision to bring an action in Texas, whether it was a failure to respond to disclosure notice, failure to take depositions, failure to mount a very

good opposition brief in summary, why does all that matter?

Because some of this is in here. You say -- in one of the claims, one of your proofs is defendants misunderstood the patent -- well, maybe I can -- that was meant to be at the outset of the case, I could understand that. But pursued a faulty/careless strategy not only during investigation but during discovery and prosecution of the case. Why does that matter?

MR. ROSEN: It matters, Your Honor, because if -- if I were to have my druthers and I would argue this in court, the way I would argue it to the jury, Your Honor, in order to perfect the scheme that the defendants set upon this path to carry out, it required some pontificating and some pretending and some looking as if they were going through the motions and partaking in all the things the system had to offer the party and the lawyers.

And to do that, for the firm to make its money, to bill the fees that it was necessary to bill -- we're almost up to $10 million at this point, Your Honor -- then there was -- some of the charade had to carry on.

And it wasn't just enough to have the bad advice at the very beginning. But a lot of the plaintiff's damages were incurred after the bad advice. And the bad advice that resulted in us going down the litigation path resulted in years and years of litigation fees and, ultimately, sanctions, as

your court mentioned, all because they were pursuing a nonsensical, unprovable litigation.  If --

THE COURT:  That was destined to lose from the very outset, no matter what they did, right?

MR. ROSEN:  I think that I have no alternative but to say that.

THE COURT:  Okay.

MR. ROSEN:  I know we got off track a little bit last time.  And I went through the transcript, Your Honor, and I thought I was doing pretty well for most of the hearing, and then I was baited into talking about what-ifs.  I can't say that anyone ever would have found infringement.

THE COURT:  Okay.

MR. ROSEN:  There was certainly no evidence of it at the trial.  There was no effort to find it in the underlying action.  So I'm going to assume and plaintiff's going to go into court and say there simply was no actual infringement, whatsoever; and, because of that, they could not have won that case.

I also believe -- it's not part of the state case, but we would make it part of this case here -- that it could not have won for another reason.  And that is a Palm Treo is not a card, nor is any device that was available by technology then that had a stylus or an antenna or was thicker than three-quarters of an inch.  Any of those things.

They did not comport with Mr. Hennige's original '311 patent, although, they convinced foreigners, who had money to spend, that they could convince a court and a jury and opposing parties that this, meaning a Treo, is a card.  So for that separate reason, it could not have won.

**THE COURT:**  So I understand how, therefore, the claim construction will kind of come in through the back door to a certain extent, because you will argue that there was no reasonable construction that could have prevailed, that could have gotten you over the Palm Treo equals a card.

**MR. ROSEN:**  Yes, Your Honor.

**THE COURT:**  That doesn't require me to actually construe, to actually come up with a definitive construction as if this were a patent case.  All you need to show is that within the range of potential constructions, this was not one of them -- or a reasonable construction.  So far off the map.

**MR. ROSEN:**  As a matter of law.

**THE COURT:**  As a matter of law.

**MR. ROSEN:**  Yes, Your Honor.

**THE COURT:**  So that I understand.  What I don't understand is, for instance, ignoring -- a defendant ignored the evidentiary component necessary -- necessarily a part of the opposition of summary judgment.  They did a lousy job in opposing summary judgment.

**MR. ROSEN:**  Yes.

**THE COURT:** Well, first of all, you're already asking to recover all the fees that were incurred, whether they -- whether they did well or not well. If he was destined to lose in the first place, you should get it all back, your client should get it all back.

And if they were inefficient, that's already in there because you paid for the inefficiency. If they prolonged it by, you know, an extra 3 million bucks or whatever in fees, that's all included in your damages. That's all stuff that flowed from the decision at the outset. So what they actually did, it's already included in the damages.

Second, to the extent that they did a lousy job in responding to summary judgment, in a way would save you some money -- your client some money, because if they did a good job and -- and forestalled summary judgment and actually beat summary judgment, and then incurred another $20 million for trial only to lose, in some ways your client is better off.

So I don't understand why we would have, as part of this trial, looking at how they handled a summary judgment or -- you know, I mean that's one example.

**MR. ROSEN:** It is, Your Honor. It is an example. And it's a double-edged sword.

Yes, they saved us money by not taking all of the depositions that they said they were going to take, that they even noticed to be taken here in the district.

But on the other side, Your Honor, uhm, this was a continuing errant strategy and plan.  And so while they saved us some money by not taking the depositions, at some point in time they might have been able to discover it.  They might have been able to discover the evidence.

I rather think, Your Honor, that noticing the depositions and not taking them a tacit admission by the defendants that they were just blowing smoke.  None of those depositions would have resulted in any infringement -- in any infringing activity --

**THE COURT:**  All right.  Well, if you're saying some of the conduct they took is evidence of their own knowledge that this case wouldn't -- there wasn't any -- there was no "there" there and this was just blowing smoke, I guess I could see that.

But if you're trying to show that they handled something incompetently, not as evidence of a kind of a conspiracy or state of mind, but just plain ol' incompetence, they didn't -- they didn't submit evidence, they didn't do this, they didn't make the right arguments, they didn't oppose the transfer, et cetera, et cetera, that's where I don't see how -- number one, it's already not covered by your damages.  Because if you succeed in your initial theory that this was bad advice to go down the bad road, everything that happened down that road is going to be causally related.

**MR. ROSEN:**  Yes, Your Honor.

**THE COURT:**  Whether there was a malpractice component or not.  So the only relevance I would see would be to show a state of mind, that this was -- this was a conspiracy -- I hate to use the word; I use that loosely -- but a plan at the outset to basically --

**MR. ROSEN:**  To defraud the plaintiffs.

**THE COURT:**  -- to defraud or mislead the plaintiff.

And the fact that they didn't bother to take a deposition is evidence that they knew there was never a case at all.

**MR. ROSEN:**  Yes, Your Honor.

**THE COURT:**  Okay.

**MR. ROSEN:**  Because a competent lawyer would not have done that.  A competent lawyer would have noticed the deposition and carried through with it.  And it was more than one time.

**THE COURT:**  Okay.  So if that's the case, tell me why -- and I will say that your response, interestingly, doesn't exactly -- they're not exactly joinders here.

You paraphrased some of the plaintiff's proffer and then kind of took -- I'm not sure each one of these is necessarily accurate, but whatever it is, you've got what I think is a clear statement now that their theory is going to be that there was no actual infringement, that they could not have

ever won the case.

Which suggests that any sort of traditional elements of malpractice like, well, you should have done this, you should have done this, you should have done this, is not relevant unless for these very narrow purposes that I mentioned, that -- that counsel has mentioned; that is, to show this was part of conscious intent, reflects on their intent and their knowledge at the outset.

And the outset means they're wrong at the first place; that is, leading them -- leading E-Pass down the decision -- the litigation road, not the licensing road.

MR. HOFFMAN:  Well, first, Your Honor, there is a difference of opinion as to the conduct of defendants.  And we are confident that we will be able to present evidence that there was an adequate prefiling investigation, that there was the requisite due diligence, there was the requisite reasonable investigation to meet what is essentially a Rule 11 standard. Was there a sufficient basis for going forward with this case.

THE COURT:  And sufficient disclosures.

MR. HOFFMAN:  And sufficient disclosures to the clients.  And the clients with eyes wide open and, you know, over ten years of failure of monetizing this patent at all, said, I recognize the risk, let's go forward.

THE COURT:  Roll the dice.

MR. HOFFMAN:  So there is a difference of opinion

right there.  Assuming --

          **THE COURT:**  I think that's what the case -- I assume that's what the case is going to be about.  He's going to present one side saying there was never a chance.  And you're going to say that our pre-investigation was adequate, revealed that there was a reasonable, professionally-judgment-driven conclusion that this was a reasonable case to bring.  In other words, a sufficient likelihood of success.

          **MR. HOFFMAN:**  Right.  And that it was handled as further proof and evidence of the competency and the good handling of the case and the reasonable conduct of the defendants; the defendants' conduct in connection with the case was an appropriate response and appropriate effort to try to monetize this patent.

          And, you know, there -- there were 15 motions for summary judgment before success was finally reached by the defendants in the California case.  There was a summary judgment.  There were years of litigation.  Half the legal fees and expenses were incurred in connection with the Texas case.

          Two or three weeks before trial was commenced, the Court in the Texas case grants summary judgment to the defendants in that case.

          You know, there's -- there's different areas of conduct and different areas of inquiry on behalf of the defendants that we think it is appropriate for us to establish

and present to the jury, that this wasn't a case of any attorney trying to --

**THE COURT:**  Well, why would handling the post decision, handling the prosecution of the case be relevant, other than to show their -- or negate their claim that there was fraud?

I mean, at the end of the day, wouldn't it simply be that you would say here's our investigation, here's what we found, here's what we knew, here's why it was reasonable?

And I suppose you could say, and, indeed, through discovery we found XYZ in addition to ABC, which shows we had a reasonable ...  We don't have to get into, well, here's why we took a great deposition or here's why we made this decision, this is why we chose to transfer or not to transfer.  It's what did you have in the end?  What did you have on your ammo belt?  How many bullets did you have?

You know, it would be interesting to know how much you had when the advice was given, but I suppose it might be relevant what you found later on to prove that, yeah, we had a case.  Maybe we had bad luck with bad judges or whatever, but we had a reasonable case, and that negates his case.

**MR. HOFFMAN:**  That's interesting.  Under that theory, I suspect if defendants established to a jury that there was a reasonable basis for going forward -- not that you're going to be successful, but there's a reasonable basis for going

forward, the case is then over.

THE COURT: Isn't that what -- you're saying there wasn't a reasonable basis to bring this case in the first place.

And you're saying there was a reasonable basis.

I thought that's what this case is about. Shouldn't have ever gone down this road. We should have just tried the monetizing through the licensing scheme and not through litigation.

And your position was it was a reasonable case. Sure, we lost in the end, but it wasn't malpractice to advise the client that this was -- you know, you win some, you lose some.

MR. HOFFMAN: Well, that's certainly what we thought the case was about when we went before the California Court of Appeal. And that's what the California Court of Appeal thought the case was about, as well.

You know, if -- if plaintiff establishes that no reasonable attorney would have ever pursued this case, then defendants only needed to show that it was reasonable for an attorney to pursue this case and that the risks were provided to the client.

THE COURT: So I could see how any evidence -- sort of call it after-acquired evidence, there's an argument why that might be used to bolster your position that the prefiling

investigation was adequate, your claim construction was -- was a reasonable one.  May not have prevailed, but it was one that was reasonable.

And you would argue that, no, it wasn't reasonable at all.  There was never a chance -- there was never any evidence of actual infringement.  I guess you could even point out the fact that, even as we sit here today, where's the actual evidence of infringement?  I don't know what the evidence actually is.  And, therefore, you could have never won the case.  So it still focuses on the decision at the outset.

**MR. ROSEN:**  It starts there, Your Honor.  But what do we do with a fact like, after the summary judgment motions were granted in the Northern District, after they were granted, and we turned our attention to the Microsoft case.

With the Microsoft motion for summary judgment pending, the defendant spent $91,000, up to and including the day of the hearing date, to prepare for trial with a trial consultant who was running a mock trial.

Even though the judge said in the transcript, depending upon what happens here in the motion for summary judgment you'll have enough time to prepare.

But defendants went headlong into this shopping spree of litigation consultancy.  And that has to at least affect plaintiff's claim for breach of fiduciary duty.

So much of what happened to the plaintiffs here

started out, yes, as bad advice and as malpractice, but it also morphed into a breach of fiduciary duty because this continuing relationship between the defendants and E-Pass's client was abused at every turn.

THE COURT:  Isn't the $91,000 part of the damages for your basic case?

MR. ROSEN:  For the malpractice case?

THE COURT:  Yeah.

MR. ROSEN:  Yes.  But for the breach of fiduciary duty case, isn't that a separate claim?  Knowing that they had a very reasonable chance they were going to lose in Texas as they had lost in the Northern District of California and went ahead and spent this money recklessly?  Used their clients' money like it was their own piggy bank?  That's a separate claim for breach of fiduciary duty.

THE COURT:  You mean regardless of whether or not it was advisable to bring this case in the first place, putting that aside because you already have a claim for that -- you have both a breach of fiduciary as well as a negligence claim for that.  But putting that aside, you're saying you have a separate action for breach of fiduciary duty on the decision to hire a consultant for $91,000, when they knew that -- in other words, if you lost the initial claim, that it was bad advice, and the jury were to conclude, okay, it wasn't that bad of advice, it was a reasonable shot, that you still would be

maintaining the claim that arises during the decision-making during the course of litigation to spend money.

MR. ROSEN:  To spend money, to appoint -- self-appoint oneself as the secretary and treasurer of the company, knowing that in Mr. Weiss's litigation past the very same thing had happened to him, where he was denied access to discovery documents because he had also self-appointed himself as a corporate officer.

At some point in time it's also, just as a fiduciary, a lawyer, just can't do that.  Yes, bad advice.  Bad case. Never going to win.  But to milk it and turn it that way is a total violation of the defendant's fiduciary duties.

THE COURT:  Well, so you're saying even if you were to lose on the bad advice claims, which encompass both -- finds its way both in the fiduciary duty, breach of fiduciary at the outset of that because it was in their self-interest, conflict of interest, as well as a straight malpractice claim --

MR. ROSEN:  Yes --

THE COURT:  -- that the way things were done during the course of litigation -- assuming you'd already lost the first claim, that you could still recover elements because of the way the litigation was handled.

MR. ROSEN:  Yes.

THE COURT:  Well, then that begins to look like a traditional malpractice claim.

**MR. ROSEN:**  But it's a breach of fiduciary duty, Your Honor.

**THE COURT:**  Well, but still, in order to prove causal damages --

**MR. ROSEN:**  Do I need a case within a case to show that a lawyer shouldn't become an officer of his client after seeing it happen once before?

**THE COURT:**  And what's the damages from that?

**MR. ROSEN:**  All the damages -- all the attorneys' fees that were incurred for going through all the rigmarole and the motions to compel and the protective orders that Visa brought.  And those are all fees.  It was a delay in discovery.

And, also, $900,000 of fees collected by Mr. Weiss separately and apart from his association with Moses & Singer. A $200,000 check written to him.

**THE COURT:**  Okay.  But that doesn't have anything to do with the way the case -- litigation decisions within the case.  That's a separate issue, as I understand it.

**MR. ROSEN:**  It is.

**THE COURT:**  So -- so you're saying the damage -- taking the appointing oneself to be a corporate officer, thereby creating problems with respect to the motion to compel, which then necessitated all these motions and protective orders and that kind of thing?

**MR. ROSEN:**  It just ended up in attorney fees -- let

me put it to you this way, Your Honor.  If we lost the malpractice claim or, even better, if we had lost a summary judgment claim with a -- with a real -- with a real college try and it was just a bad luck call, or you had a good case but the judge didn't see it that way, E-Pass would still have a breach of fiduciary duty claim for the way that Mr. Weiss bilked the client.  Recklessly overbilled.  Took money for himself.  Made himself an officer of the corporation.  Did all of those things.  They're separate and apart even from the malpractice.

THE COURT:  And the standard here is not just whether there was malpractice.  To prove a breach of fiduciary claim, you have to show something different.

MR. ROSEN:  I need to show an -- I have to have an ethics expert come in here and say lawyers are not supposed to conduct themselves this way.  And no reasonable lawyer would.  Not in the handling of the case per se, but in the financial dealings that one has with one's client.  And that doesn't need a case within a case.

THE COURT:  So, for instance, you have as a proffer under this breach of fiduciary duty, E, defendants failed to procure any evidence at any time during litigation of the underlying action that the '311 patent method had ever been practiced on any of the accused devices.

Why is that -- why does that look like -- what's -- what's the damage of that?  Is it you lost the case?  Right?

**MR. ROSEN:**  Is it they never had a case.

**THE COURT:**  Pardon?

**MR. ROSEN:**  That they never had a case.

**THE COURT:**  Well, what's the damage?  I mean, if the damage is --

**MR. ROSEN:**  That's the same, Your Honor.  That's the same damage as the malpractice.  But for the breach of fiduciary duty, just so that -- I didn't want it to say once they made the decision to file, the case was over, and we can stop -- and we can stop the trial now because it's either a decision that was made poorly on February 28th, 2000, or not.

And that's not the way we see it.  Because, yes, that was a poor decision, and no case could have been won, given the information they had or they ever had.  But they also paid themselves for nothing, paid their vendors for nothing.

**THE COURT:**  Well, paying for nothing is one thing.  You're almost accusing them of theft.

**MR. ROSEN:**  There's no invoice.

**THE COURT:**  But -- okay.  That's a different claim.

They failed to procure evidence that there was, in fact -- the methodology that was ever practiced, i.e. infringement or actual infringement.  That sounds like a straight malpractice claim.

Otherwise, unless you could have won the case, had they -- had they procured the evidence, are you suggesting then

you could have won the case?  Which is very different from what you had said earlier.

MR. ROSEN:  I'm not saying that, Your Honor.  I'm not saying they could have ever won the case.  But I have to note -- I just have to note just, I guess -- we got -- we got to this point actually reading the transcript from the last time we were here.

I don't think the case was ever winnable.  I don't think there was any infringing conduct by any of the infringing devices that could have won that case.

THE COURT:  So the failure to procure evidence made no difference in terms of the outcome of the underlying actions.

MR. ROSEN:  Well, they didn't even try.  And I think that was the admission, that they couldn't.  They didn't.  They failed.  But I think it's because they knew they couldn't.

THE COURT:  Well, we're going in circles.  That's evidence of intent of this plan.  I don't see how that's an independent breach with damages, if you've already lost the initial claim, that's anything different than your initial claim that this is an unwinnable case that shouldn't have been brought in the first place.

MR. ROSEN:  I'm sticking by, Your Honor, it's an unwinnable case that should never have been brought in the first place.  But I can't ignore the way that they litigated it

afterwards in breach of their fiduciary duties.

THE COURT:  You also say, on the one hand, they didn't -- they ignore the evidentiary component to oppose summary judgment; therefore, they mounted a very feeble opposition to summary judgment.  But then, a couple of paragraphs later, you say that they instigate a strategy of delay and obfuscation in order to keep the case alive in order to stave off summary judgment.

MR. ROSEN:  That was a quote from the Appellate Court, Your Honor.

THE COURT:  Well, which way -- which way is it?  They did a crummy job opposing summary judgment, therefore, precipitating in some ways a premature summary judgment because of lousy opposition, or did they stave off summary judgment and prolong fees?  Seems to me they're not consistent.

MR. ROSEN:  What we meant to say, Your Honor, was that prior to the summary judgment motion that you're talking about, the Court made it very clear when you come back -- when you come back next time and there'll be another summary judgment motion, be sure to bring with you evidence of actual infringement because that's what you need to prevail.  And they didn't.

Now, do we want -- do I think it mattered that they were going to come up with it magically?  No.  But they were told that.  And a zealous advocate would have searched for it,

would have taken the depositions that were noticed.  And they didn't do that.  I think it's because they knew that they couldn't.

They staved off summary judgment as long as possible, Your Honor, because they made a mint on E-Pass in legal fees.  So, yes, they staved it off.  Yes, they kept the ball in the air.  Yes, they did whatever they could to keep this cash cow running.  And when it finally -- when it finally ended, it ended.

THE COURT:  I don't know.  You said they forfeited opportunities to take obviously relevant discovery.  How does that prolong things?

Seems to me, their interest in generating fees would have been to take all sorts of depositions.  Not taking scheduled depositions seems to me -- I just don't understand how that --

MR. ROSEN:  I don't either, Your Honor.

THE COURT:  But it sounds like -- frankly, it sounds like your allegations, your proffer with respect to the alleged breach of fiduciary duty are really trying to shoehorn that into what would otherwise look like a traditional malpractice case.

These guys screwed up the case.  They did a lousy job in discovery.  They did a lousy job in opposing summary judgment.  They did a lousy job in fighting off venue.  They

did a lousy job in responding to discovery, et cetera, et cetera.  But to what end?

If you couldn't have won it at all, which was your initial overarching -- and if you win that theory, everything they did, including the $91,000 on the unneeded trial consultant, is, I would think, part of the causal damages, part of the recovery.

**MR. ROSEN:**  I agree, Your Honor, but that would go to show their negligence.  But three of our five causes of action are intentional torts.  And I think that that's -- if you -- if we're looking for something -- an overarching concept, I think the concept to be proven here is it's more nefarious than just malpractice.

And so I can't say that all the damages resulted from one bad decision in February of 2000.  I think a lot of the damages -- provably, a lot of the damages kept -- kept happening.  In 2002, in December of 2002, in Mr. Weiss's own handwriting is a check from E-Pass's account made payable to him.  Not reported to his -- his employer.

**THE COURT:**  Well, that's -- that's a different matter.  I mean, it seems to me -- I can understand that, you know, if something begins to look like -- I won't use the word "embezzlement," but something that looks like, you know, self-dealing, playing fast and loose in this relationship, that I understand.  That's a discrete thing.  And it may be, you

know, appointing one's self knowing that there was a risk that that was going to incur additional fees wholly apart from the bad decision at the outset, you know, I can understand that.

But, you know, failing to produce evidence, failing to take the depositions, failing to oppose summary judgment with enough evidence, that, to me, sounds like traditional malpractice action, which, led to its logical conclusion, is a theory that is inconsistent with the theory that there was no chance to win in the first place.

MR. ROSEN:  Except if you --

THE COURT:  All these in the same place.

MR. ROSEN:  Except if you agree with me, Your Honor, and that is, that wasn't the point.  The point perhaps wasn't to win the case.  The point was to keep the case going. Noticing depos, not taking them.

THE COURT:  What's your response?

MR. MCMONIGLE:  Your Honor, I guess I have two general reactions.  First of all, I think this exercise has kind of led us -- you know, your inquiries have led us to a point where it seems like through the back door is coming the trial within the trial and the traditional negligence case, because each time you put forth a particular issue, it's still relevant, but really it's really about how the case -- whether the case had merit or not.

So I think it's -- this has been instructive that

this is the type of evidence that's going to come in.  But taking plaintiff's counsel at his word where he starts, which is it never should have been filed, we never would have won, that necessarily means that on our side we're going -- our defense is, yes, we would have.  And so some form of a trial within a trial is necessary --

THE COURT:  Not you would have, you could have.

MR. MCMONIGLE:  Could have.  Right.  And that's where I'm going is that -- you know, I'm struggling with this case -- I admit that -- because it doesn't fit into the traditional boxes of the trial within trial.  But it points to maybe some -- some form of, you know, a -- a different *Markman* hearing to show whether or not the interpretation was reasonable.  Some -- some form of trial of that matter with a different standard, you know, "was it reasonable to file this action" type of trial within the trial as opposed to present the case from beginning to end and would you win or not.

And the second piece of that, which is instructive for us, is that it appears what plaintiff is going to propose is the way you never should have won is going to be presented is the orders, the statements by Judge Jensen, and you lost. And then experts are going to testify you never should have brought it.  You lost, and you never should have brought it.

And that is a sidestep of the trial within the trial. And I think that at least some form of that trial within the

trial, probably a different form than we traditionally present, is necessary.

And when you look at the case law, particularly *Mattco Forge* and *Piscitelli*, those two cases, they're instructive that it's not important, it's not the issue as to what Judge Jensen said, or that Judge Gadbois in *Mattco Forge*, it's not important what he said because it's an objective standard what should be the result. And *Piscitelli* tells us you can't substitute what would have happened in the case by having an expert testify as to what would have happened, it never should have been filed because it didn't have merit, that we have some form of a trial within a trial.

And my suggestion at this point is to get some direction from you. And you may not be, you know, in quite the position to do it yet, but some direction that there is some form of a trial within the trial. And then task this group with, you know, trying to structure it.

Because right now we have -- we think there should be some form of it. Plaintiff thinks none. And, you know, we think the case law supports some form of it. And once that determination is made by you, then I think we might make headway on how to shape it in a little better form than exists.

**THE COURT:** Well, and maybe the thing to do is for me to give this some thought and come out with kind of a structure what I think the issues as I see them likely to be, and then

have you react to see how differently you see it.  And assuming you see it my way, what the trial is going to look like.

**MR. MCMONIGLE:**  We have no choice but to see it that way, Your Honor.

**THE COURT:**  That's true.

(Laughter)

**THE COURT:**  Well, I'm open-minded.

And the other thing I'll say, you know, there's also the possibility that I will reserve bifurcating, because the last thing I want to do is complicate this so much to a jury that if you give them too much, it gets too confusing.

And it makes sense to give them the main case, see what they do with it and -- I don't know.  I don't like to bifurcate, especially if there's overlap.

I think at the end of the day, looking at the very primary case as it stands, what's different is we're not here to determine what would have happened or should have happened. It's really what could have reasonably happened.

Was it a reasonable likelihood such as to warrant the advice to go down the litigation path?  You don't have to prove you would have won, the likelihood of winning.  Just a reasonable likelihood enough such that that advice was met -- met professional standards.

Because if you're right that there was no chance at all, you know, that's -- that's something else.

Now, what that's going to look like, I have to give that some thought.  It's not going to be the same as proving the full case within the case.  But there's going to have to be some evidence about -- well, I'll say the *Markman* hearing won't be a straight *Markman* hearing.  Won't be asking me to construe this patent.

It may be more -- you know, we may have to take expert evidence as to what is a reasonable range, look at the language of this, and is it a reasonable -- was the interpretation that was a necessary predicate to this case a reasonable possible outcome of a *Markman* hearing.

MR. MCMONIGLE:  That's why I referred to it as kind of a hybrid *Markman* hearing.

THE COURT:  Yeah.  Then the question is -- that's an -- do I have to make that for the jury?  Should the jury make that determination?  It's interesting.

MR. HOFFMAN:  Well, there's -- what complicates it a bit, Your Honor, is there's several different claim constructions involved.  There's one in the California case that first was ruled against E-Pass, then reversed, then a new claim construction.  There's an entirely different one that there's no criticism of in the Texas action.  In fact, the Texas court commends counsel and E-Pass on their claim construction.  So it's not just one claim construction that's going to confront the trier of fact or Your Honor --

**THE COURT:**  Well, I'm hearing that, regardless of how many courts look at it, there's essentially one essential issue in the claim construction that's pivotal to this case, this card versus device question.

**MR. ROSEN:**  That's the most glaring one, Your Honor, yes.

**THE COURT:**  You know, the fact that other -- I'm not even sure it's relevant what other courts have done.  Maybe that might be a basis for one's expert opinion.  But, I mean, the question is, whatever the argument put forward here, was that a reasonable one?  Was that one that was within the range of professional competence, even if you didn't prevail in the end?  If it was, you know, that helps the defendants' case.  If it wasn't, it helps the plaintiff's case.

**MR. ROSEN:**  Your Honor, I also did some soul searching in this.  I reread the transcript and particularly paid more attention to it after I got the defendants' response to our proffer.  And I don't know that we are -- I don't know what we're talking about in some of the respects of this "case within a case" and all of the alleged issues in dispute.  I don't think it can be reasonably disputed by the defendants but that the patent was valid.

We've offered to stipulate to it.  Can they stipulate that it's valid?  I think they have to.  Especially if they want to say that they could have won.  If they say that the

patent wasn't valid, then they're going to lose for bringing a case they knew that was --

**THE COURT:** I suspect the area is going to be on whether or not there's a reasonable shot it could have won on the infringement claim.

**MR. ROSEN:** Fine. But had there been a test as to whether or not what they brought to the court was -- was infringing activity or not, I would understand it. If -- if the Court went one way after they brought in this mass of evidence of actual infringement, I understand it, but there was no evidence of that, Your Honor.

**THE COURT:** Well, that's the case. I mean, I'm not going to go down -- that's going to be one of the issues.

**MR. ROSEN:** So the decision's really one of law. The decision really is one of law. And there's going to be this moleculon test as to whether or not in the *Rubik's Cube* case --

**THE COURT:** It's not even a question of law. It's a question of was there a reasonable argument, for instance, that one could win the case without evidence of actual infringing. If you say there was no evidence at all, and they never had and never will, then one of the issues is going to be with respect to professional competence in advising was there a way to win this case without that.

Was there a way -- was there a reasonable argument that indirect or circumstantial evidence of infringement could

have carried the day?

MR. ROSEN:  And the law was against them.

THE COURT:  Well, maybe, maybe not.  All I'm saying is that, is there a reasonable argument?  You know, I haven't looked at that.  I don't know.  But that's an example of the kind -- I think that that's what the issue is; not what is the law.  It's what was a reasonable argument about the law that had a fair basis.

MR. ROSEN:  So it'll come down to one expert who's willing to say --

THE COURT:  It might.

MR. ROSEN:  That's what I'm talking about.

THE COURT:  I don't -- I don't see right now how you can avoid expert analysis on this stuff.  Some of this may be like a modified *Markman* hearing.  Maybe I do have to rule on it.  I'm not sure that I do.

MR. MCMONIGLE:  Well, but, Your Honor, so long as it doesn't move to the level of, you know, "you never should have won" testimony --

THE COURT:  I understand the ultimate question.  But --

MR. MCMONIGLE:  "You never should have won" testimony is not -- is not permissible.  I feel pretty clear that the case law supports that.

THE COURT:  Well, the case law you cite.  It has to

do with the ultimate question in a traditional causation question, and I understand that.

**MR. MCMONIGLE:**  Yeah.

**THE COURT:**  We are in a different area here.  And maybe the ultimate question here is not to be opined.  But in terms of what is a -- what are the reasonable ranges of *Markman* interpretations, what are the reasonable range of, you know, proving infringement, that might be.  I mean, I don't know.  I have to think about that.

We're within our one minute of my appointed time.

I think to move this forward is for me to give this some more thought about summarizing what I think the issues are and then reconvening again and maybe get your input about are we looking at the proffer and seeing exactly how that's going to play out.  I think this is an iterative process, unfortunately, as we go along.  Some stuff may be stripped along the way or put aside for bifurcation.

**MR. ROSEN:**  I noted in my notes, Your Honor, what I see as coming my way.  You brought -- I think it was number 3 of the breach of fiduciary duty analysis was the one you specifically referenced.  And I understand.

And if that is solely a malpractice issue, then it's solely a malpractice issue, and that is not determinative of the plaintiff's claims.

**THE COURT:**  Okay.  So let me get out a further order,

and then we'll check back with you when we can reconvene.

We'll have to have Betty call you and figure out another time.  We'll go through the second round of this.  At least we're -- I feel like we're moving the ball.  Not sure where it's going to end up, but we're moving the ball.

**MR. HOFFMAN:**  Thank you, Your Honor.

**MR. MCMONIGLE:**  Thank you.

**MR. ROSEN:**  Thank you very much, Your Honor.

(At 4:46 p.m. the proceedings were adjourned.)

- - - -


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Tuesday, July 3, 2012


/s/ Katherine Powell Sullivan
_____

Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter