Pages 1 – 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

E-PASS TECHNOLOGIES, INC., a )
Delaware Corporation, )
                                   )
           Plaintiff, )
                                   )
  vs. ) NO. C 09-05967 EMC
                                   )
MOSES & SINGER, LLP, a New York )
Limited Partnership; ) San Francisco, California
STEPHEN N. WEISS, ESQ., an ) Friday
Individual; and DOES 1 through 50, ) July 20, 2012
inclusive, )
           Defendants. )
_____)

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff**                Rosen Saba, LLP
                                 468 North Camden Drive, Third Floor
                                 Beverly Hills, CA  90210
                                 (310) 285-1727
                                 (310) 285-1728 (fax)
                 **BY:  RYAN D. SABA**
                                 **JAMES R. ROSEN**

**For Defendant**           Duane Morris LLP
**Moses & Singer**       One Market Street
                                 Spear Tower, Suite 2000
                                 San Francisco, CA  94105-1104
                                 (415) 957-3127
                                 (415) 723-7443
                 **BY:  RICHARD D. HOFFMAN**
                                 **ROBERT M. FINEMAN**

**For Defendant**           Long & Levit LLP
                                 465 California Street, 5th Floor
                                 San Francisco, CA  94104
                                 (415) 397-2222
                                 (415) 397-6392 (fax)
                 **BY:  JESSICA RUDIN MACGREGOR**

Lydia Zinn, CSR#9223
Official Reporter – U.S. District Court
(415) 531-6587

THE CLERK:  Calling Case C. 09-5967, *E-Pass versus Moses & Singer*.  Counsel, please come to the podium and state your name for the record.

MR. HOFFMAN:  Good morning, your Honor. Richard Hoffman, from Duane Morris, for Defendant Moses & Singer.

THE COURT:  All right.  Good morning, Mr. Hoffman.

MS. MAC GREGOR:  Good morning, your Honor. Jessica MacGregor, of Long & Levit, for Mr. Weiss.

THE COURT:  All right.  Thank you, Ms. MacGregor.

MR. FINEMAN:  Good morning, your Honor. Robert Fineman, for Moses & Singer.

THE COURT:  All right.  Good morning.

MR. ROSEN:  Good morning, your Honor.  James Rosen, appearing on behalf of E-Pass.

THE COURT:  And you?

MR. SABA:  Good morning, your Honor.  Ryan Saba, of Rosen Saba, on behalf of E-Pass.

THE COURT:  All right.  Good morning, Mr. Saba.

Well, I think we've made some progress, in terms of trying to define what the first phase of trial is going to look like, but there are a number of issues that have arisen here, both in your papers, and in what I can see.  First of all, I intend to keep the bifurcated structure.  I am not going to trifurcate this into first phase -- sort of the advice on going

down the litigation path -- and then a separate mini trial on damages, and then a third -- potential third trial on the conduct of the litigation.

I'm going to -- damages, any defenses will be rolled into the first one.  Even though that may complicate things to some extent, it's already biting off a lot to bifurcate this.  So we're going do the complete first phase.

With respect to this idea about having retained the jury and keeping the jury going straight into phase two, if necessary -- I don't see the necessity of that.  The issues are very, very discrete, it seems to me.  The claims are very different and discrete.  And I don't think there is a danger -- a substantial danger of a jury -- a second jury sort of relitigating what might have been decided by the first jury.

I think whatever conclusions are reached can be instructed and sort of directed to the second jury, if we get there; but I see these -- for the reasons why I bifurcated in the first place:  they're very discrete and different issues.

Now, I'm going to make that clear as I talk about what I think the scope is going to be.  With respect to the scope, as I stated in my earlier order, that it is really focusing on the decision to file the cases, and to eschew a nonlitigation alternative, which is the gist of the complaint, as I understand it; and, as I stated in my earlier order, that, in all likelihood, I'm going to severely limit any evidence that

occurred after litigation as a post-hoc attempt to sort of justify or explain or shed light on the decision-making process leading up to the filing of each case.

And interestingly, although the plaintiff has sought, you know, in a number of its proffers to introduce post-filing transactions or testimony or evidence, somewhat objected to by the defendant, the defendant goes on in its proffer to also suggest a whole lot of post filing in this, and, you know, memoranda from 2004 discussing X., Y, and Z, et cetera, et cetera. And I'm not going to allow that, unless there is a very specific exception or a specific need.

So one example -- and this is totally hypothetical. If somebody testifies that there was a preinvestigation, and we found evidence of X., which was a reason why we had probable cause or good cause to bring this litigation, and in cross-examination, you know, they continue to insist that they did have this evidence, but throughout the litigation, that evidence was never introduced, maybe something like that might come in as impeachment; but a very narrow purpose; not generally. You know, in all likelihood, I'm going to exclude nearly all of it. That's the whole purpose of bifurcation.

When it comes to Court orders, we've got a double problem. One is the hearsay problem. In some ways, I'll admit it seems counterintuitive that a Court order a document is hearsay, but the cases do seem to say that; at least, findings

that are made by the Court, et cetera, any statements that the Court makes.

On the other hand, obviously, Court orders which provide the predicate for the damages -- you know, losing the case, ordering attorneys' fees or costs, et cetera -- will have to come in, one way or another, either by some stipulation of fact, or maybe a recitation of the order, but not all of the reasoning and the subsidiary findings, which I think have hearsay problems; but as an operative foundational fact, obviously, there are certain Court orders that are going to have to be in evidence in some fashion, whether by way of a directed finding of fact for the jury, or through testimony or evidence or something else, or a redacted document, for instance.

Where it gets tricky is this dispute we seem to be having about whether Court orders can be referred to to support the notion or the argument that there was or was not probable cause at the beginning of the case; sort of an I-told-you-so sort of evidence.

And then I thought, you know, maybe this is what you intend; to perhaps bring it in as a basis for expert opinions, who might opine about whether it was within the realm of reasonable professional competence to advise a client to go forward, let's say, on a claim-construction matter, when, in fact, the argument is that claim-construction predicate was a

loser from the outset; and here's proof, because look what happened; look at what the Judge did later on.

I think that raises a 403 problem again, that -- to rely on a Court order, when the issue is not whether you won or lost, in terms of whether there's a breach of professional duty.  The question is whether the advice was so outside the realm of professional competence that, you know, there was not even a sufficient degree of probability or probable cause to warrant bringing the action.  And that's a different question than, necessarily, a Judge saying, "I'm going to rule this way or that way," or "I'm going to adopt this claim construction or this claim construction."  That doesn't tell you for sure that there weren't, for instance, other reasonable construction outcomes that were possible.  It sheds some light, obviously, but it's not all that dispositive.

So my analysis is that there may be some probative value to it, and something that, for instance, an expert might rely on; but the prejudicial value could be very overwhelming, if the jury just looks at what a Judge did later on in the case, and takes that as gospel, for instance.

Now, that balance may change if the Judge actually found, you know, some aspect of the case frivolous, or subject to something akin to Rule 11.  If the Judge, him- or herself, actually found this particular argument or this particular presentation or assertion was so far out of range, that it's

sanctionable, or something approaching that, then it becomes -- then it is more probative to the question at issue.

I don't know if that happened here. I don't remember now all of the rulings, but I'm just giving you my take that generally, a citation of orders, or its reasoning, its analysis and its findings not only present hearsay problems, but, I think, a 403 problem; but with a possible exception. If a Judge does find something is sanctionable, which is getting closer to the question of whether there was a reasonable cause to even pursue this line, then the balance -- the 403 balance -- shifts. You know, I don't know the rulings well enough to know whether that even comes into play here.

That's my take of how this is going to look.

So a lot of the proffers here are going to have to be trimmed, and weeded out. And I really do think that the focus will be on what was known at the time of the filing, what was represented, what was told; and the defense -- what risks were assumed, and based on what was disclosed, et cetera, et cetera. I mean, that's what this is about.

What actually happened later on in the litigation, in terms of the outcome, obviously, is a necessary predicate and foundation; but the actual course of conduct, and even the reasoning of the Court at various decision points, is not all that probative of whether there was reasonable advice given at the outset.

So that's my take.

MR. HOFFMAN:  Your Honor, if I can just ask just a point of clarification on the second phase.  Does the Court contemplate if there is a second phase when that would occur in relation to the first?

And one of the reasons that I ask that is we have not conducted or exchanged expert reports yet.  And certainly, the expert reports -- in fact, many of the expert reports may go to the second phase, as opposed to the first.  So the expense and cost of those, perhaps, can be deferred.

THE COURT:  My intent is to take a significant breather between the two, because, one, exactly for that reason:  I don't want you to incur all of these expenses, when there's a chance that the second phase might be obviated by either a verdict, or further settlement discussions.

And that is my real hope, frankly, is that whatever happens in the first case, if there's something left, that, having already experienced the pleasure of trying this case, that the parties might go back to the settlement table and have further discussions.  I want to give enough time for that, as well as to complete whatever discovery needs to be done for a second phase, which I'd rather not have you spend resources on now, if, in fact, it may not be necessary.

So it would not be a week after, or -- you know, it would be months.

MR. HOFFMAN:  Okay.

MR. SABA:  Your Honor --

THE COURT:  Yeah.

MR. SABA:  A couple of questions just come to my mind quickly here, in light of your statements.  I understand that you want to limit, if not exclude, all of the post-filing evidence.  However, what about evidence that establishes Mr. Weiss' mindset, or maybe even admissions by Mr. Weiss that were made post filing, that show what he was intending or had knowledge of, prefiling?

THE COURT:  So what's an example of that?

MR. SABA:  For example, it's -- one example is the very last piece of evidence on our proffer was a letter that came, I believe, in -- one second -- 2008, where Mr. Weiss sends a letter to subsequent counsel for E-Pass, who is Cislo & Thomas.  Cislo & Thomas were preparing the appeals.  And in that letter, Mr. Weiss admits that he did not obtain any outside opinions of counsel when he was analyzing the '311 Patent before the litigation was filed.

We see this as an admission that he did not consult with any other outside counsel, and he only performed the analysis of '311 Patent, himself.  That is the central issue in our case, because at times in his deposition, he testified that he did rely upon outside counsel, and opinions of other lawyers.  So this has become the dispute.  And we think, this,

for example, is a piece of evidence that is crucial to either impeaching him, or establishing his mindset and what he did at the time before filing.

THE COURT:  And that's what why I said impeachment is a possible route; one possible exception.

So if you get him on the stand and he says, "Yeah.  I did use outside opinions of counsel when analyzing '311," et cetera, et cetera, et cetera -- and he insists that's the case on cross-examination, yes, I would think, in the first instance, my gut would say, "Sure.  That's just not bringing in stuff to show how the case went; that goes directly to the state of mind at the time -- the relevant time frame."

So any statement about what somebody did during that time frame, even if it's a later statement, obviously, can come in; but the issue was:  What was the state of mind?  What was known then?

So when you start talking about things later, about how the litigation developed later on, you know, that's what I'm going to be looking at:  Was this something known?  Was this part of the state of mind at the time the advice was given?

MR. SABA:  So that leads me to the second of three points that I have --

THE COURT:  Okay.

MR. SABA:  -- which is:  this first phase of the trial

is going to be dependent a lot on Mr. Weiss' credibility. Obviously, we're going to say he did not perform his duties, either in a professionally competent, prudent manner, and/or it was a fraudulent conduct.

And Mr. Weiss is going to say, "I did everything appropriately and I acted in good faith."

We obviously intend to attack Mr. Weiss' credibility. And there is significant impeachment evidence which is not necessarily related to the decisions that were made, but throughout the litigation were blatant -- what we're calling "lies" that he made to third parties and his clients.

We certainly think that that impeachment evidence, even though it's not related to the actual decisions, is necessary to attack his credibility, so that the jury can weigh his credibility at the time of trial.

THE COURT:  Well, first of all, part of your credibility determination or tack is going to be based on things that happened about him assuming conflict-of-interest kind of position; writing checks to himself, or whatever it is. That's one thing.

Are you talking about the way the litigation was handled, or --

MR. SABA:  No, no.  Not necessarily, for example, a decision to take a deposition, or not; but straight impeachment evidence.  For example, Mr. Weiss says X. on the stand, and we

have testimony or documents that say *Y*.  Strictly for pure impeachment, to show the jury that his credibility is suspect.

THE COURT:  Well, I know there's, again, going to be a 403 question almost every time you raise it.  So I need to know what is the X. and what is the *Y*.

MR. SABA:  There's a litany of it.  I'm sure we can brief those now, and I can give you examples now; but I guess the idea is I want to make sure we're not limited in the amount of impeachment evidence we should be allowed to bring in while Mr. Weiss is on the stand, even if that impeachment evidence -- documents or statements -- took place post filing.

THE COURT:  Well, all I can say right now is that I would apply a 403 analysis.  And I understand the probative value is to impeach the witness, but it is like any other route of impeachment.  If things begin to get collateral and more collateral, if they begin to get into things that happened that implicate the handling of the case and begin to confuse the jury, that's going to be a negative.  If its prejudicial value outweighs the probative value, without knowing what those are, you know --

MR. SABA:  No.  And I understand that.  So I can safely assume we'll reserve that issue for, maybe, pretrial motions for what particular evidence we intend to bring in?  Is that what I'm understanding?

THE COURT:  Yeah.  I think in pretrial, though, I

think we ought to start.  Before we actually get into trial, I'd like to see a sampling of those.  Maybe we can do this by *in limine* motions, so I can kind of give you an indication of where I think that line is going to be, rather than trying to get all of this stuff in, hearing objections, and we argue for many, many minutes in front of the jury or outside of the jury. I don't want to -- I want this to run smoothly.  So I want to pretry some of this.  And maybe we can get a sampling at the pretrial conference, before the pretrial conference, of the kinds of things you anticipate he's going to be impeachable on, you know, beyond -- obviously, if he's writing checks to himself and stealing money, and shows his motive is just to milk the system, you know, that's different.

MR. SABA:  Right, which leads me to the third point that I wanted to bring up.  In phase one, we obviously intend in the damage portion to seek our economic damages, but also our consequential and punitive damages.  And, in order for the phase one to be complete, we would want to be able to bring in all of our fraudulent evidence, so that we have a complete punitive-damage picture in front of the jury.

I think that if you only permit us to bring in part of our fraudulent evidence, the jury may not get a clear picture; and then we may not get a full punitive-damage result.  And so then a phase two may only become necessary to finish up the punitive damage and fraud, whereas it seems to be more

efficient that we get all of the fraud out in phase one.

THE COURT:  And what -- when you say "all of the fraud," what are you talking about?

MR. SABA:  Primarily, billing practices that Mr. Weiss did; particularly, bilking the client of actual cash, and entering false time.  Also, the false statements and lies to the clients.

For example, one issue that's been brought up on a number of occasions wherein he told the clients that he was only going to receive 15 percent of the gross amount of the money, when it turns out that his employment contract calls for him to receive 33 percent of the money generated from E-Pass, and up to as much as 50 percent of the money from E-Pass.

His decisions, for example, to ask our client for a $680,000 loan, while simultaneously his client was facing a $680,000 attorneys'-fees motion, which he failed to disclose to our client, and which we believe -- and it's our intention to prove at the time of trial, because this was done prefiling -- that he was going to essentially borrow money from one client to pay off another client's debt.  And the evidence goes on and on.

The fraud does not necessarily relate to the way that litigation was conducted, other than the fact that he was conducting litigation wherein he knew that there was no merit to the claims.

THE COURT:  Well, okay.  When you get into the "no merit to the claims," that gets dicey.  When it's factual nondisclosure, like not disclosing a pending fee motion while asking for a loan, that doesn't get into how you were litigating, or his assessment of the merits.

What I don't want to get into is your saying, "Well, that was such a bad decision to do X., *Y,* and *Z,* and not take the depositions.  That's more evidence of his fraud."  That's where we don't want to go.

But if it's something discrete, you know -- a false representation that "I'm only getting 15 percent," when, in fact, he's getting a bigger cut; a false representation for what you need the loan for.  That's what it is.  Fake billing.  Padding the billing.  That's a discrete issue that has nothing to do with whether the litigation decision was a good one, or not, or an earnest one.  You know, I mean, I'd be inclined to allow that on the fraud theory, but not litigation decisions, and how certainly things were handled.

MR. SABA:  That's our intent, too.

MR. HOFFMAN:  If I can address that point, your Honor.  I appreciate the comments.  I dispute the comments, but be that as it may, if we're getting down to the contention that Mr. Weiss or Moses & Singer engaged in improper billing practices, and the defense to that is, "No.  The practices were appropriate.  The bills were appropriate.  Here was the work

that was done.  Here was the benefit of the work that was done," we're going to get further and further into the Underlying Litigation.  I mean, it's -- in order to defend the conduct, you have to explain the conduct.

THE COURT:  Well, I'm not going to allow a claim based on billing for activities that were not necessary, or you're arguing were not necessary.

I'm talking about if there's a claim that, you know, "I only worked two hours on this thing, but I billed for 20," that has nothing to do with whether it was a good idea to bring this motion, or depose -- it's just fake billing practice.  I mean, that's --

MR. HOFFMAN:  That's something different.  I mean, Stephen Weiss will get up and testify, "No.  If -- there is no instance like that."

But if there's a two-hour entry, and the contention is he didn't bill at all that day, or he wasn't there that day -- okay.  Maybe that's something different than:  was the work -- were you bilking the client, by engaging in work that was not necessary?

THE COURT:  That's second phase.  That's exactly what second phase is, is doing all of this unnecessary stuff; bringing unnecessary motions, or incurring all of these fees, or generating make-work, or whatever it is.  That's exactly what the second phase is.

I understood this is as saying:  he's billing for stuff he didn't do.

MR. SABA:  Correct, your Honor.

THE COURT:  Well, one of the questions I would have is:  how much testimony is there going to be?  I mean, are there hundreds of these instances?  Are there a handful?

MR. SABA:  I would say more handfuls than hundreds. And most of the false entries that we've been able to locate -- I would say the bulk of them are actual cost entries; fake costs that were charged to the client that either never existed, or were for personal use of Stephen Weiss, rather than for use of the case.  And so those don't actually go to the merits of the necessity of the decisions that were made in the litigation; but just flat-out lies; that he stole money from the client.

THE COURT:  Okay.  Fraudulent billing?

MR. SABA:  Correct.

THE COURT:  It's outright fraudulent billing for costs?

MR. SABA:  Correct.

THE COURT:  You know, as we get to trial, I want to get a notion, you know, how long -- again, if you have hundreds of these things, we could be here and have mini trials on each one of these, when --

MR. SABA:  We wouldn't bore the jury with hundreds.

We will probably select our best few --

THE COURT:  Okay.

MR. SABA:  -- or more.

MR. HOFFMAN:  So that will still be an issue to be decided at the time of the pretrial?

THE COURT:  Yeah.  I think what I need to do is sit down and figure out -- you know, normally, a pretrial is pretty perfunctory, in terms of sort, you know, sort of motions *in limine*.  I think this one's going to have to be a little more detailed.  There are some issues where I want to see something akin to a proffer as we get closer, and a concrete proffer on which transactions -- or at least some idea of how many of these transactions are going to be deemed fraudulent that are going to be the subject of this trial.  What other acts of fraud, you know, are there that are going to be -- in terms of credibility issues of Mr. Weiss?

You know, we can handle some of those by *in limine* motions.  Again, a lot of this is going to be counterbalancing probative versus prejudicial value, and trying to keep this fairly clean and comprehensible to the jury.

So I am anticipating a fairly comprehensive -- I usually do a fairly comprehensive pretrial in the case, but this will be more than the usual, because I don't want to get into disputes midstream, and lots of surprises that require us to disrupt the jury process.

MR. SABA:  And not to make all of our lives more difficult; but certainly, we would be expected to and we will set forth all of the fraudulent issues that we know of and the billing practices, and all of the transactions that we think are fraudulent; but I'm a little concerned about having us be required to list all of our impeachment evidence before trial, because that takes away some of the element of surprise at trial.  So that may have to be handled maybe in a more discreet manner, than just having --

THE COURT:  Maybe as a sampling.  I think what I indicated before was --

MR. SABA:  Yeah.

THE COURT:  -- you know, sort of a sampling of that, so I can give you some exemplary rulings to sort of know what the bounds are, because -- you know, what you mentioned is the $X$ and the $Y$.  You would kind of want to know what are some of the $X$s and $Y$s.  And so, you know, I may ask you in a pretrial order to pick out five -- or something -- examples; hopefully, a range.  And then I can tell you, "Yeah, I think that's going to survive 403," or "No.  I think this is getting beyond the pale."

MR. SABA:  Okay.  We're agreeable to that.

THE COURT:  Okay.

MR. HOFFMAN:  Another issue raised by your Honor's prior order was the claim construction.

THE COURT:  Mm-hm.

MR. HOFFMAN:  And particularly, does the Court contemplate having a claim-construction hearing before the trial, or set during the trial?  It wasn't clear to me, as to the Court's intent on that.

THE COURT:  My gut right now is not to actually do a court claim-construction process, but that is something that will be left.  I assume you were intending to have some kind of expert testimony on what the reasonable range of claim constructions were that this -- you know, that the theory of this particular case was either outside or inside that range.

Really, there's not -- I'm not intending to rule, unless you think that, as a matter of law, I have to rule whether, you know, the proposition that was set forth in the Underlying Litigation was outside a range of reasonableness.

I think that is -- I understand it's sort of legal intensive, and normally the kind of thing in a straight patent litigation that the Judge here does; but here, it's more of a question of, you know, the quality of the advice that was given.  And I think I would be invading the province of the jury to say, "Are you kidding me?" or "That's clearly -- sure, that was a reasonable."

You know, I mean, I suppose you could bring those as a summary-judgment motion or summary-adjudication motion, saying, "This one -- this construction necessary construction to the

case was so far outside the range, that no reasonable jury could find that this was within the range."  That's the only way I could see the Court giving any kind of, quote, "construction," or quasiconstruction.

Otherwise, I think if it's debatable, that's a jury question.  And it will be tricky how you present that.  It will be interesting.  I've never done this before.  It will be interesting, but it's -- you know, well, it will be interesting to watch.

MR. HOFFMAN:  And in terms of just the nuts and bolts, we had, I think, estimated a four-week trial.  Do you want us to reëvaluate that, and see if we can stipulate to something other than that, given the Court's order?

THE COURT:  Yeah.  And I think what I'll do is I'll get out a further order, sort of embodying what I said today, and then making clear that -- you know, what my intent is; but if I'm going to exclude a lot of post-filing stuff, except for very limited purposes of, you know, direct impeachment that survives a 403 analysis, or certainly goes to state of mind, specifically, prefiling state of mind, I would think that a lot of your proffer is going to be slimmed down.  And I would like to get a more realistic sense, now that we've had this discussion, of what -- how long you think this is going to take, assuming you get in about four and a quarter hours of testimony a day, because we go from 8:30 to 2:00.  And we hit

some -- four and a half hours.  I usually estimate four and a quarter hours is a fair number.

And then a day, you know, half day for jury selection. I don't know how long you want for openings and closings and jury instructions, but probably a day and a half for two days, total, to take care of things we need to do, in terms of jury instructions and selection.

MR. SABA:  I know we covered this, but just so we're clear, when we leave here, August 24th, our expert reports are due.  So we should instruct our experts to limit them to phase one issues?

THE COURT:  Yes.  Yes.

MR. SABA:  Okay.

THE COURT:  And you also raised a question of discovery.  And I don't know if you still need to extend discovery into September.  What remains at this point?

MR. HOFFMAN:  We can finish the discovery within the time frame.  The issue will be -- and we'll have to reëvaluate. Some of the witnesses that we anticipated noticing are going to be on, I think, phase two --

THE COURT:  Okay.

MR. HOFFMAN:  -- which leads to the next question. Will there be an opportunity between phase one and phase two to do nonexpert discovery?

THE COURT:  Yeah.  If there are witnesses that are

only relevant to phase two, in the interests of economy, since I am going to take a substantial breather in between, I intend to build in some time -- you know, a fairly short time, because I don't know how many.  Didn't seem like you had a whole lot of witnesses -- some time to do that, as well as do your expert disclosures, and discovery, and further mediation.  So I'm going to build in some time for a window for discovery -- nonexpert and expert -- as well as ADR.  That's why I say it would be months.

MR. HOFFMAN:  Okay.  Very good.  Thank you, your Honor.

MR. SABA:  Okay.

THE COURT:  Is there -- remind me.  Is there any ongoing or possibility of -- ADR possibility at this juncture, between now and trial?

MR. HOFFMAN:  We have continued to communicate through the prior mediator as recently as last week.  We do not have anything -- any formal session currently set.

THE COURT:  Well, now that you have your proffers, which is quite detailed, I don't know how deeply you got into it with your neutral, but there's certainly more information now than -- I think it will be more concrete, is all I'm saying, and even more concrete after today.  You'll have a better idea what it's going to look like.

So to the extent that, through this pretrial process,

we're eliminating some uncertainty, and you'll have a clearer picture of how this may play out, you know, whether that's an opportune time to have further discussions, I'll leave that to you; but maybe this process we're going through here could be put to good use.

MR. ROSEN:  Your Honor, the respective counsel have maintained good rapport in discussing our options in the case. Our last formal ADR session was back in September.  And there's have been a couple of starts and stops that didn't result in anything, partly because, admittedly, the parties are very far apart, and there's no real willingness to move towards a center, without a corollary concession from the other.  And so we're stuck.  Maybe after the current order, and with the proffers, Mr. Hoffman and I can talk again; but that's where we find ourselves.

THE COURT:  Okay.  All right.  I'll encourage you to do so.  Meanwhile, I want to keep this train moving.  And so I will get out a brief order, kind of summarizing what we've done.  And let's see.  Pretrial conference is scheduled for January.  We probably should reconvene one more time before then, and make sure we're on track.  Maybe in October?  Early October?

THE CLERK:  October 5th at 10:30, your Honor.

MR. ROSEN:  Works for us, your Honor.

THE COURT:  That works?

MR. HOFFMAN:  Just one second, your Honor.  That's fine, as well.

MS. MAC GREGOR:  Mr. McMonigle's in trial.  I don't have his October calendar with me.  I will -- it's okay on my calendar, but if for some reason he's not available, I will let the Court know.

THE COURT:  All right, or whether you can stand in --

MS. MAC GREGOR:  Yes.

THE COURT:  -- competently, adequately for him, that's an option, as well.  We'll see you in a couple of months.

MR. HOFFMAN:  Thank you, your Honor.

MR. ROSEN:  Thank you, your Honor.

THE COURT:  Okay.  Thanks.  some this day this case is going to make the case books.  Civil procedure.  Evidence.

MR. SABA:  If it hasn't already.

(At 11:19 a.m. the proceedings were adjourned)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Lydia Zinn                                      July 20, 2012
_____
Signature of Court Reporter/Transcriber    Date

Lydia Zinn, CSR#9223
Official Reporter – U.S. District Court
(415) 531-6587